[Crim. No. 5035.    In Bank.    Jan. 26, 1950.]

THE PEOPLE, Respondent, v. EDWARD ALBERT HUIZENGA, Appellant.

Elvin F. Sheehy, Public Defender, and Clarence H. Pease for Appellant.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Edward Albert Huizenga was convicted by a jury of first degree murder and has been sentenced to death. On this appeal from the judgment under Penal Code, section 1239(b), the sole issue is whether the evidence is sufficient to justify the conviction.

On January 18, 1949, the body of a male person was taken from the American River east of the Jibboom Street bridge in Sacramento County. The body was headless, clothed only in a suit of underwear, with the legs tied together at the ankles with a piece of sash cord. Fingerprint records established the identity of the body as that of Arthur Paulson. On January 24th, the decapitated head was found, and the identity of the body confirmed. The county autopsy surgeon, Dr. Wallace, performed autopsies on the torso and head. On

the right side of the head there were multiple small fractures of the bones radiating in several directions. One piece of the temporal bone about an inch long had been driven into the brain, presumably by a dull object. Dr. Wallace testified that death had been caused by laceration of the brain, subdural hemorrhage, and the multiple fractures of the skull.

On January 20th, defendant was found living in a tarpaper shack that had been owned and occupied by the decedent. Defendant stated, in answer to questions before trial and while testifying on his own behalf, that he had known Arthur Paulson since September, 1948, when they met while picking tomatoes. They camped together east of the Jibboom Street bridge until about the first of November. At that time, they separated and went to different parts of the state where harvesting was in progress. Defendant said that he returned to Sacramento County about December 15th. He pitched camp in the same area that Paulson and he had occupied during September. The morning of December 17th, defendant met Paulson, who invited him to move to the shack that Paulson had constructed from tarpaper and wooden poles. Defendant did not stay with Paulson that night but moved in with him the following day, December 18th. Paulson slept on a bunk, and defendant slept on boxing board laid on the dirt floor.

Defendant testified that Paulson went into Sacramento on December 21st to obtain a lamp for his shack. This testimony was corroborated by the witness Doucet, a neighbor in the camp area, who met Paulson in Sacramento about noon. Paulson was on his way back to the cabin with the lamp. He was in good humor and did not speak of leaving the vicinity. There is no evidence that he was seen alive thereafter except by defendant.

Defendant testified further that when he returned to the shack early in the afternoon, after trying unsuccessfuly to find work, Paulson was already there cooking. He looked upset and acted queerly. When defendant inquired what was wrong, Paulson told him that "on the way home he had been strong-armed and robbed of $50.00." Paulson told defendant that he would not be in Sacramento the next day, that he was going to Ventura for work. That night defendant and Paulson read the newspapers and retired around 8 or 9 o'clock.

Early the following morning, December 22d, defendant awoke when Paulson was building a fire. Paulson made up his bedroll containing his blankets, a suit of underwear, and

cooking utensils and tied the roll with sash cord. Defendant asked Paulson if he was going to store his property. Paulson said he was going to take what he wanted and told defendant: "You can have what I leave." Paulson had certain items of property belonging to one William Allen that he told defendant to leave with Doucet if defendant left before Allen returned.

Later in the day defendant saw Doucet and told him that Paulson had been strong-armed the previous afternoon and that $50 had been taken from him. Defendant told Doucet that Paulson had gone to Ventura and that he took his bedroll and his clock, leaving everything else for defendant. Doucet visited defendant at the shack around 11 o'clock that morning. He observed that a suit of Paulson's underwear was on the line and that defendant was slicing bacon that had belonged to Paulson. Defendant said that Paulson had left all his food for defendant. Doucet observed defendant later constructing a latrine near Paulson's shack about 100 feet from Doucet's.

On the same day defendant visited the cabin of Eugene Belanger in the same area. He had not previously spoken to Belanger. He told him substantially what he had told Doucet concerning Paulson's being robbed, becoming disgusted, and going to Ventura. The following day, defendant passed Belanger's camp with a rifle and a gunny sack and told Belanger that he was going hunting. Belanger thought this odd because the day was foggy and "you couldn't see fifteen feet ahead of you." Belanger testified, however, that the fog lifted around noon.

Doucet testified that two or three days after December 22, he observed defendant taking some of Paulson's clothes and a suitcase out of the camp area. Defendant told Doucet that he was going to put them in storage. The records of Bill's Second-Hand Store in Sacramento, however show, and defendant admits, that on December 23d he sold certain articles belonging to Paulson. Defendant used the assumed name, James Owens, and gave the address 1515 Fourth St., Sacramento, where he had previously resided. On December 29th, he sold a shirt of his own to the same store under the same assumed name.

On or about December 24th, Doucet observed defendant burning straw that he had taken from the bunk in the cabin. He replied to Doucet's questioning that he was burning it because the mice had been making nests in it. Defendant

replaced the straw with three sofa cushions that he had purchased after Paulson's disappearance.

Early in January, 1949, Earl King and two others constructed a cabin in the Jibboom Street jungle area about 100 feet from the one occupied by defendant. While they were building, defendant went to them and told them that the land was "private property or leased property." King replied that he had as much right there as anyone else. Defendant said then, "Well, if you are going to build down here, be sure and use my latrine," and from then on, King and his companions did so. On January 18th, King discovered the headless body, later identified by fingerprints as that of Paulson, floating in the American River near the camp area.

On January 20th, three deputy sheriffs went to Paulson's shack, then occupied by defendant. When they questioned him about Paulson, defendant explained Paulson's departure as he had previously to Doucet and Belanger. The officers found a small caliber rifle, a small hatchet, and some sash cord rope in the shack.

On January 21st, the deputy sheriffs returned to the jungle area to search for the head of the body. Their attention was directed to the latrine that defendant had constructed on the day that, according to his testimony, Paulson had left for Ventura. After digging into the latrine about 2 feet, they discovered a folded pair of dark trousers; a foot lower they discovered a large bundle of clothing in an olive green tarpaulin. The bundle included a large green blanket, sleeping bag, dark coat, red checkered shirt, glove, and a large blanket. These were identified by William Allen as the property of or similar to the property of Paulson.

The officers also removed two sheet blankets from the bunk in the cabin, and pieces of wood from the bottom and headboard of the bunk, which were marked with a reddish stain. A clinical laboratory technologist, Roy B. Johnson, Jr., testified that the stains on the tarpaulin, the coat, and plaid shirt taken from the latrine, and the two blankets from the bunk, were human blood. Johnson found blood on the sleeping bag and blanket taken from the latrine but was unable to determine whether it was human blood. David Q. Burd, a criminologist of the State Bureau of Criminal Investigation, testified that the small hatchet found in the shack on January 20th, the pieces of wood taken from the bunk, another hatchet

owned by Paulson, and a hammer left with Paulson by Allen had blood of unknown origin on them. He testified that the block of wood taken from the headboard of the bunk had human blood on it. Dr. Wallace, the autopsy surgeon, testified that the blade of the small hatchet fitted ''almost perfectly'' the wounds on Paulson's neck. He testified also that the hammer part of the hatchet could have been used to cause the fractures of the skull.

At the time defendant was questioned on January 21, 1949, he was asked to tie a knot in the sash cord found in the decedent's cabin. The knot that he tied was similar to the knot in the rope around the ankles of the decedent's body.

Defendant was first tried in April, 1949, but the jury was unable to agree upon a verdict. Thereafter on April 22d Deputy Sheriff Chapman returned to the site of the Paulson shack, which had been torn down, to make a further investigation on his own initiative. He dug into what had been the dirt floor of the cabin and found buried there a small bottle containing $50 in currency. The next day Chapman returned with two other deputies. After more digging they uncovered four small pieces of newspaper that were identified as parts of the Sacramento Union dated January 17, 1949. Deputy Sheriff Munizich testified that the newspaper came from the hole in which the bottle was found. Counsel for defendant vigorously attacked the testimony given by Deputy Sheriffs Chapman, Munizich, and Mason concerning their visit after the first trial to the site of Paulson's shack. He said, ''We contend that this case and the evidence produced herein is the result of planted evidence.'' There is no evidence in the record to support this contention.

In statements to the officers and in his testimony, defendant consistently adhered to his original account of Paulson's departure and the reasons therefor. His statements and testimony varied as to the articles Paulson took from the shack, and he admitted that he lied to Doucet about Paulson's taking several articles that in fact he did not take. He offered the explanation that Doucet was in the habit of ''cleaning up'' after the former occupants had gone. Defendant at first denied the sale of Paulson's articles to the secondhand store, but after his handwriting had been compared with his signature in the sale book, he admitted making the sale. He admitted working on the latrine the day Paulson left and asking others to use it, but he denied placing Paulson's property in it. He has always denied that he killed Paulson.

The trial court instructed the jury that "Crime may be proven by circumstantial evidence as well as by direct evidence of an eye witness, but the facts and circumstances in evidence must be consistent with each other and with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence, and must show his guilt beyond a reasonable doubt.

"If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilty beyond a reasonable doubt."

These instructions afford ample protection to a defendant in a case based on circumstantial evidence. (See *People* v. *Bender*, 27 Cal.2d 164, 174 [163 P.2d 8] ; *People* v. *Green*, 13 Cal.2d 37, 44 [87 P.2d 821].) Guided by these instructions, the jury found defendant guilty of murder in the first degree.

Defendant contends that the evidence is insufficient to justify the conviction on the ground that it fails to meet the requirement (embodied in the first paragraph of the instructions quoted above) that "[r]esting its case upon circumstantial evidence, the prosecution must not only show a set of circumstances consistent with guilt, but must show a set of circumstances inconsistent with any reasonable theory of innocence." (The quotation is from opinion of Justice Preston in *People* v. *Lamson*, 1 Cal.2d 648, 653 [36 P.2d 361]; *cf. People* v. *Perkins*, 8 Cal.2d 502, 510 [66 P.2d 631] ; *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) This contention confuses the function of court and jury by implying that if the court itself can formulate a reasonable theory of innocence from the evidence it must reverse a judgment of conviction. It is not for the court, however, to determine

whether it can formulate such a theory. It must assume in favor of the verdict the existence of every fact that the jury could reasonably deduce from the evidence and then determine whether or not a reasonable jury could find the defendant guilty beyond a reasonable doubt. "If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Thus, "the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review." (*People* v. *Newland, supra,* at page 682.)

"The functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or non-existence of a reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge's function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind." (*Curley* v. *United States,* 160 F.2d 229, 232.)

█ In the light of the evidence in this case the jury could reasonably be convinced beyond a reasonable doubt that defendant killed Paulson to obtain possession of his belongings and money.

When the witness Doucet met Paulson in Sacramento on December 21st, 18 hours before he disappeared, Paulson had just acquired a lamp for his cabin and gave no indication that he was likely to leave Sacramento suddenly. Immediately after Paulson's disappearance the next day, defendant assumed ownership of Paulson's goods, much of which Paulson would normally have carried with him while travelling. The first morning after that disappearance defendant dug the latrine in which the decedent's bloody belongings were found. He encouraged others to use the latrine.

Defendant sold Paulson's goods under a fictitious name and lied when questioned about it. He admitted selling the goods only when informed that state experts had compared the handwriting in the sales book of the secondhand store and samples of his handwriting, and had found that they were similar.

Two days after Paulson disappeared, defendant was seen burning straw from the bunk Paulson had used. Defendant admitted "cleaning up around" the bunk and burning "reddish" paper that had been under the straw. A block of wood subsequently taken from the headboard of that bunk by the officers, and two blankets found on the bunk on January 21st, were stained with human blood. The rope found in the cabin on January 21st was the same type as that used to tie the ankles of Paulson's body. When defendant was asked on January 21st to tie a knot in that rope, he tied one similar to that used to tie the legs of the corpse.

The blade of the small hatchet found in the cabin fitted the wounds on Paulson's neck "almost perfectly." According to the testimony of the autopsy surgeon, the hammer part of the hatchet could have been the blunt instrument used for the fatal blows.

A bottle containing the sum that defendant specified as the amount stolen from Paulson was found buried in the floor of the shack. In the same hole were newspapers dated January 17, 1949, three weeks after Paulson's disappearance on December 22, 1948.

In the light of this cogent evidence we cannot say that a reasonable jury could not find defendant guilty beyond a reasonable doubt.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.