[Crim. No. 7171. Second Dist., Div. One. Apr. 25, 1961.]

THE PEOPLE, Respondent, v. DARRELL LEE GRAHAM, Appellant.

Bradford A. Arthur for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of murder in the second degree.

In an information filed in Los Angeles County the defendant was charged with willfully, feloniously and maliciously murdering Michele Bechtel on or about October 24, 1959. It was further charged that prior to the offense in question the defendant had been convicted of and served a term in prison for robbery and that he had been convicted of and served a term in prison for escape. The defendant admitted the prior convictions and pleaded not guilty. A jury found him guilty of murder in the second degree. Defendant waived any right to apply for probation and was sentenced to the state prison. This appeal is now taken from the judgment.

A résumé of the facts is as follows:

Harriette Graham (hereinafter referred to as Harriette) met defendant in or near Las Vegas, Nevada, approximately nine years ago when she was 16 years of age. She left Nevada and came to California with defendant where they lived together. The defendant was arrested for armed robbery and Harriette was taken into custody, released to the juvenile authorities and ultimately sent home. In 1951 she met and married a man named Pierce. Three children were born as the issue of that marriage, namely: Theresa in 1953, Doran in 1954 and Michael in 1956. That marriage terminated in

1957 and Harriette married Michael Bechtel on March 28, 1958. Michele Lee Bechtel, the victim in this case, was born as the issue of that marriage on April 14, 1958. Another child named Carey was born as the issue of the last-mentioned marriage.

Starting in 1956 Harriette wrote several letters a week to the defendant while he was in Folsom Prison. In June of 1959 she and her five children went to Riverside and lived in the same house with Mr. Pierce and shortly thereafter she received a letter from the defendant and left for Santa Monica to see him.

In 1959 she made an agreement with Mr. Pierce that he could take custody of their three children. She took an apartment in August 1959 and defendant moved in with her in approximately a week. She worked at a restaurant in Westwood Village because she and defendant could not live on his earnings. On Thursdays, Fridays and Saturdays she worked from 6 p.m. to 2 a.m. and sometimes longer on Fridays and Saturdays. Each Sunday and Monday she went to work at 11:30 p.m. and left at 7:30 a.m. The defendant worked at a machine shop from 8 a.m. until 4 p.m. He got home at approximately 5 p.m. and she would leave for work shortly after he arrived. He usually took her to work and called for her in the mornings. The children were cared for by him at night and by her during the day. Harriette and defendant were married on October 20, 1959, she having discovered that her marriage to Bechtel was bigamous.

On September 29, 1959, defendant brought Michele Lee and Carey to the restaurant to pick up Harriette after her work. Michele Lee had a cut on her forehead and the defendant told Harriette that they had been involved in an automobile accident which had caused the cut. The cut was bloody. The child was taken home and bandaged but was not taken to a doctor.

A day or so later Harriette noticed that the child was "getting dark spots on her." Defendant told Harriette that he had taken the child to a doctor and had been told that "it was bad circulation of the blood." Compresses were applied and the discoloration disappeared. On October 6th Harriette noted that the child had a cut near one of her eyes, a swollen lip, cut mouth, general bruises and that one eye was very swollen. Defendant told Harriette that a mirror had fallen and had struck the child. When it was suggested by Harriette that they should take the child to a doctor, the

defendant answered in the negative, giving as a reason, "because they would think something else was wrong with her, that he had hit her or something" and that he would have to go back to prison. Harriette indicated that she would not take the child to see a doctor but on the next day she did so.

A doctor at a clinic examined the child and determined that she had multiple bruises; was in great pain; the right eye was swollen shut; her throat, chest and mouth were bruised; she had lacerated arms, legs, and trunk, and bruises generally over the entire body. A collar bone was fractured. It was the doctor's opinion that the marks on the throat were caused by someone's squeezing the neck or holding the child by the throat, that the child had been beaten, and that the bruises ranged from 12 hours to one week in age. The fracture came from a hard blow and the doctor indicated that it could have been caused by a human fist. The doctor told Harriette that the child was in critical condition and should be hospitalized at once, and told her to take the child to the U.C.L.A. Hospital, where he had made arrangements for the admission of the child. The doctor made out a report of the examination and retained one copy thereof.

Harriette took the child and went to see the defendant at his place of business. She informed defendant of what the doctor had said and showed defendant the report. Defendant denied hitting the child and became angry and directed Harriette not to take the child to the hospital. She was directed to the house of a friend of the defendant's and told to stay there until the defendant got off work. Harriette was frightened and thought that the police would not believe the defendant and would cause him to be sent back to prison. The defendant joined Harriette about 5:30 p.m. and they registered in a motel under the name of Logan Kent, where they remained with Michele Lee and Carey to October 13th. They then returned to their old address. Michele Lee seemed to improve and the bruises cleared up. Harriette continued to work during this period of time.

About 5 p.m. October 23, 1959, Harriette left for work and at that time Michele Lee appeared to be all right. She had no bruises or cuts on her face and no marks or injuries to her head. Harriette returned home about 5:45 a.m. When she entered the apartment she saw defendant standing by a curtain near the couch upon which Michele Lee was sleeping. The child was covered with a blanket, except for a part of her face. Harriette glanced at Michele Lee and her other

child and then went into the bedroom. Michele Lee started to cry and defendant picked her up. Defendant told Harriette that Michele Lee was probably having a nightmare and for her, Harriette, to get ready for bed. Harriette went to bed and awakened about 7 a.m., at which time she noticed that Michele Lee was gone. She found a note on the kitchen table in defendant's handwriting which set forth that he had taken Michele Lee with him to work. Upon reading the note Harriette went back to bed and later was awakened by the defendant who said, "I have done a terrible thing"—"I have killed Michele." When asked how he had killed Michele the defendant said, "I threw her." Defendant prevented Harriette from getting up out of the bed and told her that it would be of no use to take the child to a doctor—that she was beyond help. Defendant told Harriette to shoot him, that he would be better off dead. Carey started to cry and defendant then permitted Harriette to get up. Harriette told defendant that they should call the police but the defendant said no to that, and talked of ways and means of burying Michele Lee. He suggested that he could tell everybody that his mother had the child and that they could go along as though nothing had occurred. He further stated that if the police saw the body he would go back to prison and would die for it.

While defendant and Harriette were in the apartment a man named Alo, who worked with defendant, inquired as to why he, the defendant, was not at work and defendant told his friend to go away, that he would not be at work that day. Defendant said he was going to go to Las Vegas and told Harriette not to call the police for a couple of hours, thereby giving him a head start. Defendant wrote a note to his employer directing him to give his check to Harriette. Harriette left the house with Carey and went to a neighbor's where she was admitted. Harriette asked the neighbor to call the police. The neighbor suggested that Harriette do the calling and she then did call the police. Within a short time the police arrived and Harriette left with them, leaving Carey with the neighbor.

In the meantime defendant went to the house of a coworker, Pete Stewart. Defendant had Michele Lee covered with a blanket in the back seat of the car. At Stewart's house defendant saw Stewart and Mike Stanton. Defendant asked and received permission to use Stanton's car. Stewart and Stanton drove defendant into the Hollywood hills and there

defendant buried Michele Lee. The shovel which was used to dig the grave was thrown away in a bean field along the route. Defendant then went to his mother's house and talked with her. After this he went to his own apartment, where he was arrested. The police searched for and found the body of Michele Lee. Blood was found on the sole of the left shoe of a pair of shoes found in defendant's apartment.

After defendant's arrest he wrote to Harriette:

"You can't just forget, Midge, because as you know, I'll return, and as you know, you're the first one I will see if I have to walk from here to New York barefooted, I'll find you. That's a promise."

A Mr. Johnson testified that in September 1959, defendant bought a used car from him and that at such time he saw defendant, Harriette and the two small children and he told defendant that he would gladly adopt the little girl, "because he noticed her condition right away."

The autopsy surgeon stated that Michele Lee came to her death from intraperitoneal hemorrhage due to lacerations of the liver and spleen. The liver was split nearly in half. There were hemorrhages below one of the coverings of the brain. There were numerous contusions and bruises on the body, bruises on the neck and upper lip and bruises on both sides of the nose, forehead, abdomen, left thigh, left chest and other places. In the opinion of the surgeon the marks on the throat were caused by "fairly strong force" and could have been made by a hand pressing the throat; that a child of $17\frac{1}{2}$ months of age could not have inflicted such blows upon herself; that the injury to the liver was caused by more than one blow or from force applied at two different places simultaneously and that the injury could have been caused by an adult male fist or foot; that the child did not die in an accidental fall and that death came about five or six hours after the blows which caused the lacerations to the liver and the spleen.

Appellant was represented in the trial and up to a point in this court by Bradford Arthur, an attorney. The defendant communicated with this court and in effect requested the court to take such steps as might be proper to bring about the discharge of Bradford Arthur as defendant's attorney. This court obviously had no such power or authority. Bradford Arthur had filed an opening brief in behalf of the appellant. In open court Arthur stated:

"I understand from Mr. Graham and also from the Clerk of this Court, I believe, Mr. Graham is dissatisfied with my representation. I would further state that 3 or 4 of the letters I have received from Mr. Graham asked me to continue with my representation and two did not. I would state also to the Court that knowing his family, this was my reason for staying in. As attorney of record perhaps it might be wise that I type a registered, return receipt letter to Mr. Graham stating what position the case is in and the fact that I do not wish to represent him. I will submit on the appellant's opening brief and would protect myself as his counsel and in that way possibly avoid any future motions on the part of Mr. Graham."

The court thereupon asked Arthur whether he was or was not representing the appellant and Arthur responded that he had not been discharged as counsel of record. When Arthur was then told that appellant had written to the court and stated among other things:

"If it pleases the court defendant hopes that the appellate court will notify the trial court that Bradford Arthur is no longer attorney of record."

Arthur answered:

"That is not true."

The court indicated to Mr. Arthur in the following language that all it wanted to know "is whether you are or are not this man's attorney and if you are, we presume you will get a stipulation and dispose of the matter and if you are not why obviously you will advise him to that effect and give him sufficient time within which to submit a brief of his own." The following then occurred:

"ARTHUR: I agree with what you said, Sir. That is why I suggested immediately writing to the appellant because I do not know as of this moment whether he wishes me to go ahead or whether he does not wish me to go ahead and I certainly don't want to be in the position as I understand from the court's point of view of going ahead and the man in his own mind no longer considers me his attorney of record. I know that I filed the notice of appeal and that the opening brief is my opening brief and I know that I have received letters from him indicating that he is not satisfied and without going into any indications whatsoever, I know why he is not satisfied and it has nothing whatsoever to do with the opening brief.

"The Court: Well, the question's been raised and properly so that you either know now or you don't whether you represent this man.

"Arthur: Well, on that basis, Sir, I would ask to be relieved as his counsel at this time. . . .

"The Court: Does he want to represent himself or does he want other counsel?

"Arthur: Your Honor, it is extremely difficult to understand just exactly what he does want on the basis of his letters to me. I would, if I may suggest, I would I believe still ask to be relieved. I will immediately inform him that I have been relieved and it is my feeling from the tenor of his letters that he will probably represent himself.

"The Court: Well then as that is how it is, the court will make the order to be relieved as counsel for the defendant and we will make an order that defendant be given until December 1st in which to file his brief."

The appellant was notified of what had occurred in open court and no request by him was made that counsel be appointed to represent him. On February 21, 1961, the court received and filed "Appellant's Additional Brief on Appeal."

 The brief prepared by Arthur makes the contention that it was error to give CALJIC Instruction Number 301, which reads as follows:

"301 Murder—Malice—Definitions

"Murder is the unlawful killing of a human being with malice aforethought.

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart.

"Malice aforethought, either express or implied, is manifested by the doing of an unlawful or felonious act intentionally, deliberately, and without legal cause or excuse. It does not imply a pre-existing hatred or enmity toward the individual injured."

It is to be noted that both the defendant and the People requested the giving of the instruction numbered CALJIC Number 301. In short, it seems to be the defendant's contention that the court permitted a violation of due process of

law by permitting a presumption of malice in effect to overcome the presumption of innocence. In other words, that malice must be proved as such and cannot be presumed.

The court also gave CALJIC Number 302 which provides that if the verdict is murder, then the jury must determine the degree thereof. This instruction was requested by both parties. The prosecution requested and the court gave CALJIC Number 302A as modified with reference to murder by torture and likewise gave CALJIC Number 302D with reference to the same subject matter.

Both parties requested CALJIC Number 305 which sets forth the law with reference to murder in the second degree and both parties requested CALJIC Number 303 with reference to premeditation in first degree murder. The court also gave, at the request of both parties, CALJIC Number 310 wherein murder and manslaughter are distinguished and CALJIC Number 305A with reference to the course which should be followed by the jury in the event of a doubt as to whether it was murder in the first or second degree. The court also gave CALJIC Number 308A with reference to voluntary manslaughter.

At the request of defendant the court gave CALJIC Instructions Numbers 308B and 309 with reference to involuntary manslaughter and CALJIC Number 320 with reference to excusable homicide and CALJIC Number 115 with reference to necessarily included offenses and CALJIC Number 115A with reference to a conviction upon a lesser included offense.

The prosecution requested and the court gave CALJIC Numbers 311 and 311A concerning heat of passion and provocation. It is quite apparent that with the instructions mentioned and the other usual instructions, the jury was fully informed of the law in the matter involved.

The prosecution in any event seemingly relied in this case upon the evidence which was introduced in court rather than upon any presumption to show the malice of the defendant. The bare recital of the facts of this case leaves no doubt about the ''malice aforethought'' of the defendant. There was no reason to call upon any presumption of malice. (See *People* v. *Lint,* 182 Cal.App.2d 402, 411-412 [6 Cal.Rptr. 95]; *People* v. *Scott,* 176 Cal.App.2d 458 [1 Cal.Rptr. 600]; *People* v. *Toth,* 182 Cal.App.2d 819, 824 [6 Cal.Rptr. 372].)

■ The presumption of innocence does not overcome conclusive presumptions nor even some disputable presumptions. ■ It was said in *People* v. *Theodore*, 121 Cal.App.2d 17, 28 [262 P.2d 630]:

"It is a rule of law that a presumption constitutes a species of evidence which, unless controverted, is sufficient proof of the existence of the fact to which it relates (*People* v. *Williams*, 125 Cal.App. 387, 388 [13 P.2d 841] ; *People* v. *Little*, 41 Cal.App.2d 797, 799 [107 P.2d 634, 108 P.2d 63] ; *People* v. *Sberno*, 22 Cal.App.2d 392 [71 P.2d 274] ; *Hefferman* v. *United States*, 50 F.2d 553).

"Appellants next insist that the foregoing presumption 'clashes' with the presumption of innocence. We fail to see the force of this argument. All presumptions as heretofore stated, are a species of evidence. Conclusive presumptions (Code Civ. Proc., §§ 1961, 1962) are not overcome by the presumptions of innocence, nor are many disputable presumptions so overcome (*People* v. *LeDoux*, 155 Cal. 535, 553 [102 P. 517] ; *People* v. *Cline*, 79 Cal.App.2d 11, 15 [179 P.2d 89] )."

In *People* v. *Agnew*, 16 Cal.2d 655, 662-663 [107 P.2d 601] it is stated:

"Defendant's argument that there cannot be two conflicting presumptions in a criminal case and that the presumption of innocence outweighs all other presumptions finds some support in the language of certain decisions such as *People* v. *Strassman*, 112 Cal. 638 [45 P. 3], but the effect of such language is clearly nullified by the decision in *People* v. *LeDoux*, 155 Cal. 535, the court saying at page 553 [102 P. 517], 'The instructions declare that the presumption of innocence is the only presumption allowable in a criminal case, that it is not overcome by any other presumption, but does overcome all other presumptions of whatsoever kind or nature. Such, however, is not the law. All presumptions are evidence. Conclusive presumptions (Code Civ. Proc., §§ 1961, 1962) are not overcome by the presumption of innocence, nor are many disputable presumptions so overcome.' It thus appears that some disputable presumptions are allowable in criminal cases and the question arises as to whether a presumption of unlawfulness is allowable in a criminal prosecution upon a charge of unlawful imprisonment."

■ Furthermore, as heretofore indicated, defendant requested the judge to give the instructions about which he now complains.

 We will now consider the contentions made by the appellant in the "Appellant's Additional Brief on Appeal." Appellant asserts that it was error to introduce certain photographs into evidence for the inspection of the jury. It was among other things the contention of the prosecution that the murder in question was by torture and that it was important to demonstrate to the jury the numerous injuries upon the victim. The pictures were marked for identification. Arthur took the witness on *voir dire* examination with reference to the pictures and thereafter the following occurred:

"MR. ARTHUR: Now, if it please the Court, I am going to ask that the Doctor put up on the bulletin board here, if it is possible, just tack them up and go through the exhibits one by one with me. I feel that would be easier for the Doctor. It certainly would be easier for me. And point out, demonstrate which are bruises and which are abrasions.

"MR. ALARCON: *Do you want to stipulate that the exhibits may be received?*

"MR. ARTHUR: *I will stipulate to that at this time.*

"MR. ALARCON: We will accept that stipulation.

"THE COURT: The exhibits will be received in evidence as marked. . . .

"THE COURT: Would there be any objection to tacking them up and starting with this phase of your examination the first thing Monday?

"MR. ARTHUR: None whatsoever." (Emphasis added.)

Thereafter the court adjourned until the following Monday. On the following Monday, in the judge's chambers, the record discloses that the following occurred:

"MR. ARTHUR: And I would also like to indicate for the purpose of the record, that it is my understanding as to the photographs now, that although I have requested that they be placed on a bulletin board, that as yet they have not been admitted into evidence.

"MR. ALARCON: *Yes, they have, counsel. By your stipulation.*

"THE COURT: *Yes, they have.*

"MR. ARTHUR: *Then that is all right. I just wanted to have the record clear on that.*

"MR. ALARCON: Page 339 of the transcript.

"THE COURT: *They were received in evidence as marked.*

"MR. ARTHUR: *Fine, I have nothing further then.*" (Emphasis added.)

The initial objection was predicated upon the contention that "their materiality is outweighed by the prejudicial effect against defendant."

■ It is stated in *People* v. *Brubaker*, 53 Cal.2d 37 at page 48 [346 P.2d 8] that:

"Whether the probative value of a particular photograph outweighs its possible prejudicial effect is a question to be resolved by the trial court in the exercise of its judicial discretion. (*People* v. *Cheary*, 48 Cal.2d 301, 312 [9] [309 P.2d 431]; *People* v. *Carter*, 48 Cal.2d 737, 751 [11] [312 P.2d 665].)

"The photographs . . . were properly received by the trial court within the exercise of its discretion, in that they tended to clarify technical testimony of the autopsy surgeon regarding the injuries sustained . . ."

■ Even, however, assuming for the purpose of argument that the trial court should have sustained the objection, *it was counsel for the defendant, Mr. Arthur, who actually introduced the photographs into evidence.* Clearly, appellant's contention is without merit.

■ Appellant's next contention is that the district attorney committed prejudicial error in his closing argument and that the trial judge should have cautioned him and struck from the record all comments concerning a witness not called, even though there was no objection.

Appellant makes the above set forth contention, but the record before this court does not contain the arguments made by counsel. The reporter's transcript merely contains the following:

"SANTA MONICA, CALIFORNIA, THURSDAY, FEBRUARY 18, 1960:

"9:30 O'CLOCK A. M. . . .

"THE COURT: You may proceed.

"(Argument by counsel.)

"(Whereupon, at 4:00 O'CLOCK P. M. an adjournment was taken in this matter until 9:00 O'CLOCK A. M. of the following day.)"

■ It is fundamental that error will not be presumed. In the absence of evidence to the contrary, there is a presumption of lack of error.

Appellant also asserts that the circumstantial evidence was insufficient to support the conviction.

Appellant states that it is violative of due process "for a defendant to be convicted on circumstantial evidence unless inconsistent with any other natural conclusion."

What was stated in *People* v. *Ross,* 120 Cal.App.2d 882 [262 P.2d 343], is pertinent and dispositive of appellant's contentions. Therein the court stated at pages 885-886 as follows:

"Appellant contends that, as a matter of law, . . . the circumstantial evidence was insufficient to warrant his conviction. But, as stated in *People* v. *Huizenga,* 34 Cal.2d 669, 675-676 [213 P.2d 710] :

" '. . . This contention confuses the function of court and jury by implying that if the court itself can formulate a reasonable theory of innocence from the evidence it must reverse a judgment of conviction. It is not for the court, however, to determine whether it can formulate such a theory. It must assume in favor of the verdict the existence of every fact that the jury could reasonably deduce from the evidence and then determine whether or not a reasonable jury could find the defendant guilty beyond a reasonable doubt. . . .

 Thus, "the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review. (*People* v. *Newland, supra* [15 Cal.2d 678 (104 P.2d 778)] at page 682.)

 " ' "The functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or non-existence of a reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point

certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond a reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. ▮▮▮ The judge's function is exhausted, when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind." (*Curley* v. *United States*, 160 F.2d 229, 232.)' "

▮▮▮ A conviction of criminal homicide may be arrived at solely on the basis of circumstantial evidence. (*People* v. *Todd*, 154 Cal.App.2d 601, 607 [317 P.2d 40]; *People* v. *Reed*, 38 Cal.2d 423 [240 P.2d 590]; *People* v. *Huizenga*, 34 Cal.2d 669 [213 P.2d 710]; 25 Cal.Jur.2d, Homicide, § 173.)

▮▮▮ Appellant further argues that the trial court erred in giving instructions on confession and admission.

The trial court did give four instructions pertaining to confession and admission. Specifically, appellant's attack is directed to the instruction which defined a confession and an admission. This instruction as read provides as follows:

"29. (Revised.)

"DEFINITIONS OF CONFESSION AND ADMISSION

"Evidence has been received in this case tending to show that on [occasions] other than this trial the defendant himself made [statements] tending to prove his guilt of the alleged crime for which he is on trial.

"[A statement thus made by a defendant may be either a confession or an admission.]

"A confession is a statement that was made by one who is a defendant in a criminal trial, before the trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary.

"If under my instructions you find that a voluntary confession was made, you are the exclusive judges as to whether or not the confession was true; and in deciding that question you should consider all the circumstances immediately connected with the making of the statement, as shown by the evidence and all other evidence bearing reasonably upon the question.

"[An admission is something less than a confession in that, by itself, it is not sufficient, even if true, to warrant an inference of guilt, but which tends to prove guilt when considered with the rest of the evidence. It may consist of any

statement or other conduct by a defendant whereby he expressly or impliedly acknowledges a fact that contributes in some degree to the proof of his guilt of an alleged crime for which he is on trial, and which statement was made or conduct occurred outside of that trial.]

"[If you should find that a confession or an admission was false in any particular, it remains, nevertheless, evidence for your consideration in connection with all other evidence in the case, to be given such significance and weight as your judgment may determine.]"

The above instruction was requested by the People and given as modified (*i.e.,* modifications illustrated).

Specifically, appellant urges that "This was a trial of circumstantial evidence alone, nothing more, in the opening statements to the jury the trial judge stated that the prosecution had informed him that at no time would any witness say they heard the defendant say he had committed the crime charged nor had the defendant confessed to the offense charged."

The reporter's transcript does not contain what was stated in the opening statements. It appears in the minutes of February 8, 1960:

"It is stipulated that said transcript shall commence with the swearing of the first witness."

The record further discloses that Mrs. Graham testified as follows:

"Q. You were in bed and you were awakened by the defendant, is that correct? A. Yes.

"Q. What is the first thing he said to you when he woke you up? A. He says, *I have done a terrible thing. He said, I have killed Michele.*

"Q. *I have done a terrible thing. I have killed Michele. Is that correct?* A. *Yes.*" (Emphasis added.)

On cross-examination, the same witness testified as follows:

"Q. Isn't it a fact that on the morning that your husband awakened you at 8:00 o'clock that he told you that a terrible thing had happened, that Michele was dead; isn't that a fact? A. *No. He stated that he had killed her.*

"Q. You are absolutely positive about that? A. *Yes. He come in and he says, 'I have done a terrible thing.' He says, 'I have killed Michele.' I says, I asked him how. He says, 'I threw her.' I said he was wrong and I tried to get up and I wanted to go to her and get some help for her. He said, No, that she was beyond my help.*

"Q. I see. A. But he did it. He told me he did it." (Emphasis added.)

It should be noted that the cautionary instruction pertaining to evidence on an oral admission[1] was requested by both the People and the defendant, and was given as requested.

■ Appellant's next contention is predicated upon the assumption that his wife was an accomplice; that a conviction cannot be had upon the testimony of an accomplice unless it is corroborated; and finally, that there was not sufficient corroborative evidence. Prior to any discussion with reference to the sufficiency of the evidence, an inquiry will be directed to whether appellant's wife was an accomplice in the crime of murder.

Appellant's contention is based upon the fact that his wife participated in the concealment of the child from the police. As heretofore indicated, the record discloses that on or about October 6, 1959, the appellant, his wife, and the children moved into a motel under an assumed name. They all remained at the motel until October 13th, at which time they all returned to their residence.

The circumstances surrounding the move to the motel were not associated with the murder of the child.

As to the physical condition of the child *subsequent* to the time that the defendant, his wife, and the children had moved back into their home (i.e., October 23, 1959—some 10 days *subsequent* to the time they left the motel), the defendant testified as follows:

"Q. She looked all right to you at that time? A. Well, you say looked all right to me?

"Q. Yes, sir. A. No, she did not.

"Q. Tell us what looked bad about her at that time? A. Well, she had bruises on her.

"Q. Tell us about the bruises? A. *They were bruises that were almost gone, but they weren't completely healed.*" (Emphasis added.)

The transcript indicates that Harriette testified that the child was "perfect" while defendant testified "They were bruises that were almost gone, but they weren't completely healed."

---

[1] "29-D EVIDENCE OF ORAL ADMISSION TO BE VIEWED WITH CAUTION
"The law of this state admonishes you to view with caution the testimony of any witness which purports to relate an oral admission of the defendant or an oral confession by him."

The difficulty with appellant's contention that his wife was an accomplice is that the "concealment" occurred some 10 days *prior* to the time that the fatal injuries were inflicted.

The doctor who performed the autopsy testified that the cause of death was "Intraperitoneal hemorrhage due to lacerations of liver and spleen." He then testified as follows:

"Q. All right. Do you have an opinion as to how old the injury was to the liver? A. Yes. *I believe that it would have caused death within several hours.*

"Q. *Within several hours after the blow being inflicted, is that correct?* A. *Yes.*

"Q. *If I understand your opinion, then, the injury to the liver and the spleen, the injuries to the liver and the spleen, were sufficient in and of themselves, in your opinion, to cause the death of this child, is that correct?* A. *Yes, that's right."* (Emphasis added.)

As to the "subarachnoid hemorrhage" the doctor testified as follows:

"Q. Doctor, you said the subarachnoid hemorrhage could have occurred within days of blows to the spleen and liver. Would you give an outside estimate as to—you say within days, how many days would you say, Doctor? A. *2 at a maximum."* (Emphasis added.)

California Penal Code, section 1111, provides as follows:

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. *An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."* (Emphasis added.)

Appellant's contention that his wife was an accomplice to the homicide is without merit. In any event, there is evidence, other than the testimony of his wife. ▮▮▮ Where a homicide has been committed and the body concealed, it is a legitimate inference that the person who concealed the body is connected with the crime, either as its direct perpetrator or as a participant. (*People* v. *Peete,* 54 Cal.App. 333, 346 [202 P. 51], discredited on other grounds in *People* v. *Kelley,* 208 Cal. 387 [281 P. 609]; 25 Cal.Jur.2d, Homicide, § 176; see anno. 2 A.L.R. 1227 and supplements thereto.)

Appellant also argues that "The trial judge erred in not striking out Mrs. Grahams [*sic*] testimony when it was so obvious to the Court, that she was indeed fully and thoroughly impeached to such an extent that her complete testimony was invalid."

The simple answer to this contention is that the questions of credibility of witnesses and weight of evidence are to be determined by the arbiters of the facts, not by the appellate courts. (*People* v. *Williams*, 150 Cal.App.2d 171 [309 P.2d 525] ; *People* v. *Wilder*, 151 Cal.App.2d 698 [312 P.2d 425] ; *People* v. *Freytas*, 157 Cal.App.2d 706 [321 P.2d 782] ; *People* v. *Treggs*, 171 Cal.App.2d 537 [341 P.2d 342] ; *People* v. *Etress*, 171 Cal.App.2d 682 [341 P.2d 384] ; Code Civ. Proc., § 1847 ; Code Civ. Proc., § 2061.)

Appellant asserts further that it was error for the court to grant the prosecutor's motion to strike certain evidence. We have carefully read the entire record and in short the appellant attempted to impeach his own witness upon calling her to testify in his own behalf after she had testified for the prosecution, and after full cross-examination as such prosecution witness. The judge was correct in his rulings.

It is set forth in 54 California Jurisprudence 2d, Witnesses, section 174 :

"Before a witness may be impeached by proof of inconsistent statements a proper foundation must be laid. In the language of the code, 'the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them.' "

Furthermore, the appellant did get before the jury by another witness the matter he was attempting to present to such jury in the first instance, namely, that his wife Harriette was responsible for his being sent to prison on the armed robbery charge.

Where a party has had full opportunity to cross-examine a witness, he may not thereafter call the witness in his own behalf and ask her a question solely for the purpose of impeachment. As stated in *People* v. *Denton*, 22 Cal.App. 2d 673 at pages 675-676 [72 P.2d 191] :

"After the People had rested their case the defendant called . . . as his own witness and asked her a question regarding a statement made to her mother upon the question of identification of defendant, which question he stated was solely by way of her impeachment. The court sustained the

objection thereto. The defendant contends that the court erred in sustaining such objection. In the case in chief the witness upon her direct examination on behalf of the People identified defendant as her assailant and she was cross-examined at length upon that subject. In the cross-examination, however, appellant failed completely to question the witness concerning whether or not she was able to identify defendant other than by his voice. Afterwards when the defendant used her as his own witness he sought to develop the fact that at the time she had reported this attack to her mother she had told her mother that she could not identify the defendant other than by his voice. Under this contention defendant cites a large number of cases to the effect that in cases of rape the defendant should be allowed a wide latitude upon cross-examination. *These are entirely beside the point, for the defendant was allowed a wide latitude and was wholly unrestricted upon any material points in his cross-examination of the witness.* These cases relate to the impeachment of the prosecution's witness upon cross-examination and are not applicable here where defendant sought to impeach his own witness. This situation is governed by section 2049 of the Code of Civil Procedure, which provides that a party may not impeach his own witness but that he may contradict such witness by other evidence. *It is not permissible for one to call a witness in his own behalf and ask such witness a question solely for the purpose of impeaching such witness, which is what the defendant sought to do in the instant case.* [Citations.]'' (Emphasis added.)

Appellant's last contention is that it was error to instruct the jury in the matter of flight. The instruction read as follows:

''FLIGHT AFTER CRIME

''The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt, and the signifiance to be attached to such a circumstance, are matters for your determination.''

There was ample evidence to warrant the giving of the instruction. (See *People* v. *Jordan,* 45 Cal.2d 697 at p. 706 [290 P.2d 484].)

The matter of the hearing of the oral argument was set for March 28, 1961. On or about the 24th day of March, 1961, this court received from the appellant a communication, the essence of which was that he wanted Arthur to be present in his behalf at the oral argument before this court. In any event on March 28, at the time set for hearing the oral arguments on the regular calendar of this court, Arthur appeared and sought a continuance in this case because, as he stated, he was not prepared to proceed at that time. The case was then continued, on Arthur's request, to April 10, 1961, on a special calendar for this particular case. Arthur neglected to appear at 10 a.m. on April 10th, the time set for the hearing of the oral argument on the special calendar. The matter was then continued until the afternoon and Arthur, in the meantime, was contacted and directed to appear at the afternoon session. He did so and at that time he announced that the case would, so far as he was concerned, be submitted without argument and he further stated that he had not looked at the matter since he was in court on March 28. Such conduct is not conducive to the proper administration of justice.

We find no reversible error in the record.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 21, 1961.