[Crim. No. 6448. In Bank. Nov. 10, 1959.]

THE PEOPLE, Respondent, v. CHARLES EARL
BRUBAKER, Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), Richard S. Buckley and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of two counts of murder after trial before a jury.

Viewing the record in the light most favorable to the People, it discloses that about midnight on Sunday, July 20, 1958, defendant strangled to death Irene Potter Morey and her 9-year-old son, Craig Potter Morey, in Mrs. Morey's flat in Los Angeles.

Defendant presents these questions:

First. *Was the evidence sufficient to support the verdicts finding him guilty of murder in the first degree?*

*Yes*, for these reasons:

(a) The following rules are here applicable:

 1. Where there is substantial evidence in support of a jury's verdict, it must be upheld. (*People* v. *Caritativo*, 46 Cal.2d 68, 72 [1] [292 P.2d 513] ; *People* v. *Eggers*, 30 Cal.2d 676, 685 [2] [185 P.2d 1].)

 2. Proof of deliberation, premeditation and willfulness may be inferred from facts and circumstances which furnish a reasonable foundation for such a conclusion. (*People* v. *Caritativo, supra,* at 72 [3] ; *People* v. *Byrd,* 42 Cal.2d 200, 213 [17] [266 P.2d 505].)

 The record discloses that defendant freely and voluntarily, without promise of immunity or hope of reward, made the following confession to police officers after his arrest: On July 20, 1958, he had dinner with Mrs. Morey and her son in her apartment; before and after dinner he and Mrs. Morey each had a couple of drinks of vodka and orange juice; the son went to bed about 10 p.m.; and about midnight defendant "made a pass" at Mrs. Morey, and after a little petting she took off her shorts, that is, just raised up, tugged at them, and pulled them off.

Defendant was questioned, and answered as follows:

Q. Start from when you were watching television with her in the living room and the boy walks in.

A. Well, the boy was in bed and I made a pass at Irene, and she accepted the pass, so she took off her shorts. She had her blouse open all the way, and just before the actual act of intercourse was attempted, the boy walks in and sees his mother and I there.

Q. Were you both lying on the sofa at that time?

A. Yes, and she became panicky having her son see her like that. She started making a commotion and yelled that I was raping her. Well, I got excited and he said he was going to call the law, so I hit Irene in the jaw with my fist, knocked her out and I tied her hands behind her back. Then I ran after the boy. He had run into the bedroom and dragged him out and I strangled him. Then ——

Q. How did you do that, Chuck?

A. I started with my hands and then wound up with the T.V. wire.

Q. Antenna?

A. Yes, or whatever it was. And then I sat there for a second or so and realized what I had done. So I knew she was still alive, and she started coming to, so I gagged her, put my handkerchief in her mouth, and took the other stocking and tied it around her throat, or her face, rather, and I choked her.

Q. You choked her with your hands?

A. With my hands.

Q. After you had the gag in her mouth?

A. After I had the gag in her mouth, yes.

Q. We didn't follow this a while ago, Chuck, but what did you do after that?

A. I got up and put my shirt on and left the house.

Q. How did you leave, by the front door?

A. The front door.

Q. And where did you go?

A. I drove around for a while and stopped at a bar and had a couple of drinks. I don't know what one, but I had a couple of drinks. Now, this comes to me now. I went to the drive-in at Western and Olympic, McDonnel's, I think it is, and while I was having something to eat, I guess that was after 2:00, this Tony, this cocktail waitress down at the Club 14, I met her there and that's—I remember now, I

met her. I wasn't sure whether it was Saturday or Sunday, but it was Sunday.

Q. Did you talk with her?

A. Oh, no. I just said hello to her. She was getting in her car and she looked over at me and I said "Hi" to her.

Q. Now, going back to the beginning now, Chuck, do you recall what time it was when this act of sexual intercourse was about to take place?

A. I would say it was around midnight.

Q. Around midnight?

A. Before or after midnight.

Q. Now, think it over, was it about midnight?

A. Yes, about midnight.

Q. Now, think it over very carefully, Chuck. Did you leave by the front door or the back?

A. I left by the front door and down the front steps and to my car, which was parked directly in front.

Q. Now, when you left the room, where was Irene lying?

A. On the couch.

Q. And where was the boy lying?

A. On the floor.

Q. Near the television?

A. Near it, yes.

Q. Did you rip that antenna off the window to get around this kid's neck?

A. That I don't remember.

Q. You just grabbed it? Chuck, have you been mistreated since you have been in jail?

A. No, no.

Q. Have we treated you all right?

A. I've had the best.

Q. Have you had any promises of immunity or any promises to you for telling us this story?

A. No, nothing at all.

Q. How do you feel now, physically, I mean?

A. Better than I did but I could be a hell of a lot better.

Q. You are making this statement to us because it's free and voluntary and because you want to make it?

A. That's right, yes.

Q. And because it is a true account of what happened?

A. Yes.

Q. I have one more question and nothing else to talk to him about. This story about John coming to the door ——

A. That's not true.

Q. That's not true?

A. No, it's not true.

Q. Is there anything else you want to tell us about? Anything that you can recall that's important in the case that you want to tell us about?

A. No, I can't think of anything. You've got the facts there, that's all it's going to take.

Defendant further stated that he left the apartment by the front door about 12:30 a.m. and at that time he was "dead sober." Upon leaving the apartment he drove to a drive-in at Olympic and Western Avenue, Los Angeles, ordered coffee and a hamburger, and then went home.

Defendant did not take the witness stand at the trial.

Applying the foregoing rules to the evidence set forth above, it is clear that there was ample evidence to establish that the killings were the deliberate, premeditated acts of defendant and were, therefore, murders of the first degree.

▮ (b) Section 189 of the Penal Code provides that murder which is committed in the perpetration or attempt to perpetrate rape is murder of the first degree.

Applying this rule to the record in the present case, it is clear that there was substantial evidence to sustain the finding of the jury that the murders in the present case were committed by defendant in his attempt to rape Mrs. Morey. The record discloses that early in the evening during defendant's visit with her, she was dressed in a blouse which had five buttons on its front and a pair of shorts with a zipper clip; that defendant admitted that he was attempting to have sexual intercourse with Mrs. Morey and was surprised by the entrance of her son into the room; that at that time she cried out that defendant was attempting to rape her; that after the murder when her body was discovered, only the top two buttons remained on the blouse and the other buttons were found scattered around the room; and that the shorts were completely torn from the lower portion of the zipper down to the crotch. In addition, the uncontradicted evidence discloses that Mrs. Morey had been bound and gagged, her body was battered and bruised, and there was considerable confusion in the room where she had been murdered. (*Cf. People* v. *Moore*, 48 Cal.2d 541, 547 [6] [310 P.2d 969].)

Second. *Did the trial court err in failing to give a requested instruction on the subject of voluntary manslaughter?*

*No.* The jury was fully instructed on the distinction be-

44

tween murder of the first and second degree, but the requested instruction relative to manslaughter was refused. Defendant contends that it was error not to give his requested instruction, claiming that the evidence presented by the prosecution, and in particular the evidence of his extrajudicial statements, was susceptible of the interpretation that his acts were committed without malice aforethought and in the heat of passion, thus putting voluntary manslaughter in issue.

Voluntary manslaughter is a willful act, characterized by the presence of an intent to kill, *engendered by sufficient provocation* and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought. Section 192, subdivision 1, of the Penal Code defines voluntary manslaughter as the unlawful killing of a human being, without malice, ''upon a sudden quarrel or heat of passion.''

To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would *naturally be aroused* in the mind of an *ordinary, reasonable person* under the given facts and circumstances, or in the mind of a person of *ordinary self-control.* (*People* v. *Bridgehouse,* 47 Cal.2d 406, 413 [1]-[2] [303 P.2d 1018].)

The fundamental of the inquiry in determining whether a homicide is voluntary manslaughter is whether the defendant's reason was, at the time of his act, disturbed or obscured by some passion—not necessarily fear, and never the passion for revenge—to such an extent as would render *an ordinary man of average disposition* likely to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. (*People* v. *Borchers,* 50 Cal.2d 321, 329 [6] [325 P.2d 97].)

There was no evidence that would reasonably warrant the giving of the manslaughter instruction, and therefore the trial court properly refused it.

The evidence clearly indicates that defendant's reason was not obscured, but that he acted with cold calculation and deliberation. In his confession he gave meticulous details of the murders he committed and stated that when he left the apartment shortly afterward he was ''dead sober.''

Defendant did not take the witness stand and claim that his acts had been committed while he was under the influence of liquor or passion. On the contrary, his statements to the police described in detail his actions in killing Mrs. Morey and her son and indicated that after he left the apartment he went to a drive-in, had something to eat, and then went home.

Defendant's statements clearly negate, rather than support, his interpretation of the facts as showing a killing in the heat of passion.

*People* v. *Kelley*, 208 Cal. 387 [281 P. 609], relied on by defendant, is clearly distinguishable from the present case upon its facts because, first, it was evident that the defendant had brutally killed his paramour in the course of a drinking and sexual debauch and, second, there were no extrajudicial statements from which deliberation and premeditation could be inferred.

Third. *Did the trial court err in deleting from the following instruction the portion through which lines have been drawn?* : "Evidence has been received in this case tending to show that on ~~an occasion~~ [occasions] other than this trial the defendant himself made ~~a statement~~ [statements] tending to prove his guilt of the alleged crime for which he is on trial.

"[A statement thus made by a defendant may be either a confession or an admission.]

"A confession is a statement that was made by one who is a defendant in a criminal trial, before the trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary.

"If under my instructions you find that a voluntary confession was made, you are the exclusive judges as to whether or not the confession was true; and in deciding that question you should consider all the circumstances immediately connected with the making of the statement, as shown by the evidence and all other evidence bearing reasonably upon the question.

"[~~An admission is something less than a confession in that, by itself, it is not sufficient, even if true, to warrant an inference of guilt, but which tends to prove guilt when considered with the rest of the evidence. It may consist of any statement or other conduct by a defendant whereby he expressly or impliedly acknowledges a fact that contributes in some degree to the proof of his guilt of an alleged crime for which he is on trial, and which statement was made or conduct occurred outside of that trial.~~

"[~~If you should find that a confession or an admission was false in any particular, it remains, nevertheless, evidence for your consideration in connection with all other~~

evidence in the case, to be given such significance and weight as your judgment may determine.]''

*No.* ▮ Defendant contends that he confessed only to voluntary manslaughter and that the court, by refusing to give the manslaughter instruction and by refusing to define ''admissions'' as distinguished from ''confessions,'' in effect told the jury that if they believed defendant's statements to be true he was guilty of murder, the crime with which he was charged. This contention is based upon the proposition that his extrajudicial statements may reasonably have been interpreted as indicating that the killings were rash, unfortunate acts, committed while his reasoning was obscured and he was in the heat of passion.

As pointed out above, this contention is devoid of merit. Defendant's confession, if believed by the jury, left nothing to be determined, in that it was a declaration of his intentional participation in a criminal act and was of such a nature that no inference other than the guilt of murder by defendant could be drawn from it, if the jury believed, as it did, that the confession was true. (*Cf. People* v. *Ferdinand,* 194 Cal. 555, 568 [11] [229 P. 341].)

The statements are in no way reasonably susceptible of the interpretation that the killings were rash, unfortunate acts committed in the heat of passion while reason was obscured. They clearly indicate that defendant acted deliberately and upon a pre-existing reflection. Nothing appears in his statements which might be considered as indicating that his actions in killing Mrs. Morey and her son were those of a reasonable man of ordinary self-control engendered by sufficient provocation.

▮ Fourth. *Did the trial court err in its instructions regarding the failure of defendant to testify?*

*No.* The instructions given were the standard printed forms of CALJIC (1946 ed.) 51 and 51-B. Instructions 51, 51-A and 51-B were printed on a single page, but instruction 51-A had been stricken by the process of drawing several pen or pencil lines through each word. Although instruction 51-A was thus clearly intended to be deleted, it was only partially obliterated and remained legible. The deleted instruction reads as follows: ''In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain any certain evidence against him, it would be unreasonable to draw an

inference unfavorable to him because of his failure to deny or explain such evidence.''

Defendant contends that instruction 51-A should not have been deleted and should have been given on the court's own motion, since his statements to the police indicated that he had told them all he knew and there was thus no testimony that he could have offered in further explanation. He further contends that the alleged error in this regard was compounded by the fact that the language of instruction 51-A, though deleted, was still legible and the jury might reasonably conclude that it was deleted because the court had made a judicial finding that defendant withheld information from the police.

The trial court instructed the jury in regard to defendant's failure to testify, as follows: ''It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. *As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge,* if he does not testify and he fails to deny or explain *such evidence,* the jury may take that failure into consideration as tending to indicate the truth of *such evidence* and as indicating that among the inferences which reasonably may be drawn therefrom those unfavorable to the defendant are the more probable. . . .'' (Italics added.)

The remainder of the instruction given emphasizes that a defendant's failure to testify does not create a presumption of guilt or by itself warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

The instruction as given adequately and clearly informed the jury how they should view defendant's failure to testify in their consideration of the evidence in the case and is supported by the holding in *People* v. *Adamson,* 27 Cal.2d 478, 490 [14] et seq. [165 P.2d 3].

Relative to the fact that although instruction 51-A was clearly intended to be deleted still its language remained legible, the jury could reasonably be expected to conclude nothing more than that the instruction was not to be considered.

The supposition that the jury would read the stricken language and conclude that the court had made a judicial finding

that defendant knew more than he told the police is unreasonable and contrary to the direction of instruction 51, which was read to the jury, to the effect that they might take into consideration defendant's failure to deny or explain only that evidence against him which he could "reasonably be expected to deny or explain because of facts within his knowledge."

Fifth. *Did the trial court err in receiving in evidence photographs of the bodies of the victims?*

*No.* Defendant urges that the court erred in receiving into evidence, over his objection, four photographs of Mrs. Morey and her son showing them in death. They were received in evidence over the objection that they were cumulative, were gruesome, added nothing to the case, and were prejudicial, and that no evidence contrary to the testimony of the autopsy surgeon would be offered by the defense. The first was a photograph of the front part of Mrs. Morey's face, showing the mouth open and the tongue forced back to a point where it occluded the air passage; the second was the right side of the boy's face and neck, showing multiple bruises and abrasions; the third was the left side of the boy's face and part of his chest, showing multiple abrasions and depressions; and the fourth was the boy's face, front view, and the upper chest region, disclosing multiple abrasions.

Whether the probative value of a particular photograph outweighs its possible prejudicial effect is a question to be resolved by the trial court in the exercise of its judicial discretion. (*People* v. *Cheary*, 48 Cal.2d 301, 312 [9] [309 P.2d 431]; *People* v. *Carter*, 48 Cal.2d 737, 751 [11] [312 P.2d 665].)

The photographs in question were the ordinary black-and-white type showing only limited portions of the bodies of the victims, and though these photographs were not pleasant to look at, still they were not ghastly, and even though possibly cumulative, they were properly received by the trial court within the exercise of its discretion, in that they tended to clarify technical testimony of the autopsy surgeon regarding the injuries sustained by Mrs. Morey and her son.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., Peters, J., and White, J., concurred.