[Crim. No. 7474. Second Dist., Div. Two. July 10, 1961.]

THE PEOPLE, Respondent, v. J. T. THOMPSON, Appellant.

Ellery E. Cuff, Public Defender, J. Stanley Brill and James L. McCormick, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Vincent W Thorpe, Deputy Attorneys General, for Respondent.

ASHBURN, J.—Appeal from judgment rendered after nonjury trial and from order denying motion for new trial.

Appellant was convicted of voluntary manslaughter, an included offense under a charge of murder. Appellant argues that there could be no voluntary manslaughter because (1) there is no evidence of "sudden quarrel or heat of passion" (Pen. Code, § 192, subd. 1) ; (2) the evidence is insufficient to warrant any finding of guilt; and (3) the court erred prejudicially in excluding evidence tending to show suicide or commission of the crime (if one there was) by some person other than defendant, e.g., one of the victim's visitors.

In reconstructing the events surrounding the death of the victim, Bonnie Jean Wise (commonly known as Smokey), we accept, as we must, the direct evidence and inferences favorable to respondent's case and refrain from weighing

622

conflicts in the evidence (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]) ; we recognize the prerogative of the trier of facts to accept or reject selected portions of defendant's own testimony (*People* v. *Matlock,* 51 Cal.2d 682, 695 [336 P.2d 505, 71 A.L.R.2d 605]) and to weigh, to the exclusion of the appellate court, the question of reasonable doubt (*People* v. *Dougherty, supra,* at p. 885) as well as that of whether the circumstantial evidence is inconsistent with any reasonable theory of innocence (*People* v. *Huizenga,* 34 Cal.2d 669, 675-676 [213 P.2d 710]).

The victim was a prostitute who had been living with defendant for four months and a half. They had moved into Robert Richard's house as tenants five days prior to Bonnie's death. There she received visitors and plied her trade. She died sometime before 1:10 a. m. on May 31, 1960, from a gunshot wound inflicted between 5 p. m. and 6 p. m. on the previous evening, May 30. The bullet entered her head just over the right eyebrow, split on the skullbone with one-half remaining in the brain and the other passing out behind the right ear. She also had a small cut over the left eye and a "black eye" on the right eye. There were no powder burns on the skin or like indication that the gun had been fired at less than a distance of 12 to 18 inches. The victim was found lying on the bed on her back with a bloody towel wrapped around her head. Behind the center of the bed there was a hole in the wall 3½ to 4 feet above the floor and Police Detective Sonlitner expressed the opinion that the bullet took a slightly downward path of about 10 degrees from point of origin. Dr. Kade, autopsy surgeon, said it would be difficult to conceive of a right-handed person inflicting such a wound upon herself and less conceivable for a left-handed person to do so (the victim was left-handed). Officer Wolfer, ballistics expert, gave the opinion that the bullet path indicated the gun was held more than 12 inches from the head and that in order to fire the gun from the victim's position the fingers would have to be on the butt and the thumb on the trigger and the person firing the gun would have a great tendency to miss the head.

Appellant claimed absence from the premises at the time of the shooting. But this attempted alibi was refuted by the testimony of others, especially Richards and defendant's brother-in-law, Brown. Defendant said that as he entered the house Bonnie called him "J.T." twice, and he found her on the bed with the gun lying next to her; he picked it up

and put it on the record player (using a handkerchief) and tried to clean the blood from her face, etc. Dr. Kade testified that the wound probably would have rendered her unconscious within seconds.

Richards and Hamilton arrived at the house about 5 to 5:30 p. m.; Bonnie was then "jolly and kidding"; they soon left and defendant and the victim remained alone. Then Mr. Brown arrived (he thought it about 5:30) as defendant was coming out of the door; he told Brown his girl friend was sick and he wanted a doctor. Brown went home to get the telephone number of a doctor he knew. He soon returned with it and saw the victim on the bed with a towel over her head. Appellant told him she had tried to commit suicide. Appellant then telephoned the doctor and told him his girl friend had shot herself.

About 6 p. m. Richards returned; as appellant opened the door for him he said Bonnie had tried to commit suicide. Richards went into the bedroom and saw her with a hole in her temple; defendant said " 'when he came home from the store, it happened, and he didn't know what to do about it.' " He also told Richards he did not know where the gun came from. Dr. Lassoff arrived about 6:30 and saw Bonnie on her back with her fists clenched and her elbows bent so that her fists were up at her shoulders, signifying serious intracranial injury; she was in a comatose condition. Appellant told him his girl friend had shot herself and pointed out a hole in the wall where he said a bullet had pierced it.

About 7:17 Police Officer Risher arrived and appellant said his girl friend had shot herself. The officer found the woman still breathing heavily. Asked what happened appellant said he had been away, had returned with Richards, and heard her calling him and he found her lying on the bed with the gun lying beside her and he had placed it on the record player; that he never had seen the gun and did not know who owned it. Toni Davis, Bonnie's friend, testified that four or five days before her death defendant struck Toni with that gun during an argument at that house. Appellant also told the officer that there had been no trouble between him and the victim, no argument and he had been away from the house all afternoon.

This evidence points to no one but defendant as the killer. Counsel for defendant persistently sought to show, however, that Bonnie had committed suicide. The best he could produce

in support of this theory of a factual nature is the following testimony.

Bonnie had been a narcotic addict and a pill "fanatic," of varying and rapidly changing moods. Defendant testified that on Saturday before the 30th (which was Monday) Bonnie had a long telephone conversation with her mother in which she began to cry and "she say, 'Well, if anything happens to me, if I be in the hospital or anything, my old man will get in touch with you,' so she gave me her mother's phone number and gave our number to her mother. . . . After she hung up the phone, I said, 'Well, why were you crying when you talked to your mother?' She said, 'I don't know.' She say, 'I get those moody feelings, I just call them, and every time I hear her, I just cry, you know.' " Defendant also said that within a week before her death she had remarked that she wanted to break the narcotic habit because "she wanted to stay on with me and wanted to, you know, wanted us to make it." But she never mentioned suicide, and Officer Risher testified that defendant told him he knew of no reason for her to commit suicide. Defendant said he never threatened her and they had no quarrels or arguments. Richards and Hamilton were at the house only a few minutes before the shooting and Bonnie then was "jolly" and "kidding," "jolly, laughing and talking." They left her and defendant alone in the house. Hamilton, an acquaintance of two years' standing, testified that she was always laughing when not drinking. The autopsy revealed an absence of alcohol or morphine or its derivatives in her body. So far as the evidence shows defendant, and he alone, was with her at the time of the shooting, if his own version be rejected as was done by the court.

The experts testified that a left-handed person would have difficulty in shooting herself in the manner that Bonnie had been shot. Officer Wolfer, ballistics expert, said that if the gun was held over 12 inches away from the head in the right hand the fingers would be behind the butt and the thumb on the trigger, causing a strong tendency to miss the head, and that everything would be back-handed to a left-handed person. In his opinion the gun was held more than 12 inches from the head and it was not likely that the wound was self-inflicted. There was no sooting or tattooing on or in the wound as there would be if the weapon were held less than 12 inches away and no evidence of gas blast which would accompany a contact wound. Dr. Kade, the autopsy surgeon, expressed this opinion: "It is difficult for me to conceive a

situation where a person could hold a gun at a distance more than 12 and possibly more than 18 inches from their head and fire the gun with the bullet entering at such an angle, even with the right hand; and with the left hand, it makes it even less conceivable, in my opinion.''

The trial judge specifically rejected the claim of suicide and it is manifest that an appellate court, in the face of the foregoing evidence, cannot hold the contrary on that issue.

The evidence definitely points to defendant as the murderer. His own story was rejected by the trial judge and not without ample justification. In the first place he had been convicted of second degree murder in Arizona in 1951 and had served a term in prison therefor. His testimony is impeached at the outset, but more effectually by that of other witnesses and an unerring finger pointed at him by a combination of circumstances.

His story is that he was absent from the house after 4:15 p. m. of May 30th until Richards brought him home at about 5:50 p. m. (He told the police he had been away all afternoon and reiterated that statement on cross-examination.) After they arrived at 5:50 Richards went around the corner to park his car and defendant entered the house, immediately hearing Bonnie call, ''J.T., J.T.'' Going into the bedroom he saw her lying on the bed on her back with feet hanging over the left side and with a hole in her head from which blood was freely flowing. Beside her was a gun that defendant did not own and had never seen before, so he said. He called her several times and asked what happened but received no response. Using his handkerchief to protect against fingerprints he lifted the gun onto a record player which was close to the bed; explaining at the trial, ''I didn't want my hands on the gun.'' Then he moved her feet onto the bed, straightened her and put a blanket over her. He got ice, alcohol and water and mopped and washed the blood from her face. He saw that Bonnie had been shot and started out the front door to get aid. His brother-in-law, Frank Brown, arrived just then and defendant told him that the girl friend was hurt and he wanted a doctor or something. Brown knew the name of one and volunteered to go home and get the telephone number. Defendant urged him to hurry. Brown returned in a half hour and defendant was at the bedside wiping blood from Bonnie. After defendant had telephoned him, Dr. Lassoff arrived but only after considerable delay. The doctor called an ambulance

but it did not arrive soon enough and defendant called the police. He showed them and others the gun on the record player and the hole in the wall opposite the middle of the head of the bed.[1] These persons testified that defendant repeatedly said that Bonnie had tried to commit suicide. In his own testimony he said he never had a gun there and never saw Bonnie have one. Also: ''Q. Did you know whether she had shot herself or whether somebody else had shot her? A. No, I didn't know what had happened really. I thought she had shot herself because I saw the gun there. I couldn't say one way or the other to be exact, so I just said she had committed suicide or tried to commit suicide.''

Notwithstanding this alleged ignorance defendant undertook to explain the situation to the police, the doctor, Brown and Richards. To Brown, the first arrival, he said his girl friend was sick (not that she was hurt) and he wanted to get a doctor or something. To Richards he said he had just got home and that Bonnie had tried to commit suicide; that ''when he came home from the store, it happened, and he didn't know what to do about it.'' Also: ''THE COURT: Well, the defendant said she tried to commit suicide? THE WITNESS: Yes, sir. THE COURT: And did you ask how come or how it happened or anything like that? THE WITNESS: Well, I did ask, but he said he didn't know. THE COURT: He said he didn't know how it happened? THE WITNESS: Yes, sir. THE COURT: You are sure of that? THE WITNESS: Yes, sir.'' To Officer Risher and to Dr. Lassoff defendant said Bonnie had shot herself. These fictitious explanations of the cause of Bonnie's condition were well calculated to destroy confidence in defendant's testimony and indeed they evidenced consciousness of guilt. Though he pointed out the gun to the various persons who arrived, defendant asserted to each that he did not know where the gun came from, it was not his, and he had never seen it before. This is the same gun that was on the record player several days before the tragedy, the same one he used in striking Toni Davis.

Certainly the foregoing amounts to substantial circumstantial evidence and it is not for a reviewing court to say that

---

[1]This hole in the wall presents merely a puzzling feature of this case. No bullet or portion of a bullet was found in it. The gun had in it five live rounds of ammunition and one which had been expended, and that one was in line with the barrel with the hammer closed on it. Two parts of a bullet were found, one in the brain and the other had gone out the wound back of the ear. The hole in the wall seems to present only an inexplicable feature of a puzzling situation.

it does not justify a finding that defendant did perpetrate the crime.

The claim that there could be no conviction of voluntary manslaughter in this case, though technically correct, cannot be sustained as one requiring reversal. The charge was murder. But it is proper, where the evidence justifies, to convict of voluntary manslaughter under a charge of murder. (*People* v. *Shimonaka,* 16 Cal.App. 117, 120-121 [116 P. 327]; *People* v. *Brubaker,* 53 Cal.2d 37, 44 [346 P.2d 8]; *People* v. *Lewis,* 186 Cal.App.2d 585, 596 [9 Cal.Rptr. 263].)

The definition of voluntary manslaughter occurs in section 192, Penal Code: ''Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. . . .'' When it is shown that defendant committed a homicide the crime is murder unless the evidence affirmatively shows circumstances of mitigation which would bring the crime within the definition of manslaughter. There is no possibility of involuntary manslaughter in this case and in order to make the offense voluntary manslaughter there must be proof of a sudden quarrel or heat of passion. (*People* v. *Bridgehouse,* 47 Cal.2d 406, 413 [303 P.2d 1018]; *People* v. *Brubaker, supra,* 53 Cal. 2d 37, 44; *People* v. *Borchers,* 50 Cal.2d 321, 329 [325 P.2d 97].) There is in the record at bar no evidence of any quarrel or heat of passion—nothing better than suspicion. The cut over the victim's left eye and the black right eye, standing alone, could afford basis for conjecture as to a fight, but the black eye was so close to the bullet hole as to have no individual significance. The room showed no evidence of any struggle; everything was in its place. Defendant did not claim that there had been any difficulty between him and Bonnie. On the contrary he insisted upon an alibi, that he was absent at the time of the shooting.

The finding of voluntary manslaughter was erroneous but not prejudicially so. '' 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder . . . in such a case the verdict should be murder of the second degree. . . .' '' (*People* v. *Craig,* 49 Cal.2d 313, 319 [316 P.2d 947].) See also *People* v. *Zankich,* 189 Cal.App.2d 54, 60 [11 Cal.Rptr. 115]. That is the situation here. The evidence warrants a holding of second degree murder but not manslaughter, and appellant cannot complain of a finding more favorable to him than the law

and the evidence warranted. (*People* v. *Shimonaka, supra,* 16 Cal.App. 117, 120-121; *People* v. *Muhlner,* 115 Cal. 303, 306 [47 P. 128]; *People* v. *Garcia,* 174 Cal.App.2d 525, 534 [344 P.2d 855]; *People* v. *Doyle,* 175 Cal.App.2d 309, 312-313 [345 P.2d 971]; *People* v. *Coulter,* 145 Cal. 66, 69 [78 P. 348].)

Appellant's major contention is that the court erred prejudicially by repeatedly rejecting evidence that Bonnie was engaged in prostitution and, being a white woman so engaged in a negro area, became so perturbed over her status that *maybe* she committed suicide; also that her mode of life subjected her to *possibilities* of harm from some of her clientele.

It affirmatively appeared from the evidence, produced mainly by the defense, that Bonnie was a prostitute, working at the Richards home where she had numerous visitors, that she was a white woman plying her trade in a negro neighborhood. There was also defense evidence that she was moody, a narcotic addict, a "pill fanatic." The evidence having been received later, no prejudicial error resulted from its exclusion during the prosecution's case even if the specific rulings were to be deemed erroneous. (*People* v. *Frazier,* 87 Cal.App. 65, 67-68 [261 P. 1071]; *People* v. *Singh,* 78 Cal.App. 476, 485 [248 P. 981].)

But more vital is the consideration that defendant's repeated offers of proof were invitations for the court to enter the realm of possibility and speculation.

Appellant's brief says: "In at least 12 instances the defense sought to introduce evidence bearing upon the activities of the deceased as a prostitute, and 5 times the defense mentioned her known narcotics addiction. Her activity as a prostitute and her narcotics habit were mentioned together, and defense sought to make an offer of proof to demonstrate that these activities *could have led* to mental depression,[2] to moods, to the volatile changes in mood that *could spur on* suicidal tendencies." "When appellant's counsel asked witness Robert W. Richards a question as to the occupation of deceased, and it was objected to by prosecution as to materiality, the court commented, 'I don't care what her occupation was' . . . thus revealing a failure on the part of the court to appreciate the *possible* connection between her occupation and the very strong *possibility* that a person other than appellant *could have been responsible* for firing the fatal shot.

---

[2]Emphasis added to the quotations immediately following.

When Richards was asked if deceased was using his house as a house of prostitution (a fact generally borne out by the evidence), and the prosecution objected on the basis of materiality, the court characterized this question with a remark indicating judicial non-receptivity of mind to appellant's theory of defense, calling the line of question as 'almost childish.' . . .'' ''Appellant's counsel was seeking to illustrate to the court what *might have happened* either through the prostitution activities of the deceased or because of drug addiction.'' ''The evidence as to *who might have fired the shot* is most equivocal, wholly circumstantial, and to link this evidence to appellant as the one who fired the shot is to engage in conjecture and speculation emanating solely from suspicion.'' ''The *possibility* of suicide; the *possibility that another person (other than appellant) fired the shot*; the failure of the evidence to show that appellant had quarreled with deceased, handled the gun or fired the gun are impelling reasons why there should have been a finding of 'not guilty' to the charge of murder.'' Defendant's counsel brought his various attempts into focus by this offer: ''If your Honor pleases, for the record only, we would like to make an offer of proof that as a prostitute, and a narcotic addict, and living in a colored area, being a white woman, that she was in an extremely depressed mood about her way of life and what appeared was a depression. THE COURT: Do you expect to present proof that she was extremely depressed? MR. BRILL: *I hope to,* your Honor. THE COURT: I am not going to draw any inferences from what you just said that she was. MR. BRILL: I'd hoped to, your Honor, through other witnesses. THE COURT: All right. When you get to other witnesses, *you can offer that,* that she was greatly depressed, if you wish.'' A little later the court affirmatively disclosed a disposition to receive any competent evidence. ''MR. ALSTON: I don't think that is material or relevant. THE COURT: Oh, I don't think so either. We seem to be back on the same track that we left last week. Sustained. *If you want to show any quarrel or any statements that she was going to commit suicide, all right, but if it gets back to the recurrent theme of this case, which was purely corollary, there is no use wasting time on it.''*

The situation in this case parallels *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604], wherein defendants sought to try the Mafia. We there said: ''A defendant may, of course, establish his innocence by proving directly or circumstantially that some other person or persons killed the

victim. But the mere possibility that some third person did it is not enough. There must be some competent and substantial proof of a probability that this happened. (*People* v. *Mendez*, 193 Cal.39, 51, 52 [223 P. 65] : ' " It is always proper to show that some other person and not the defendant committed the crime with which he is charged." (*People* v. *Mitchell*, 100 Cal. 328, 333 [34 P. 698, 700].) The question herein is what kind and quality of evidence is essential to that end. . . . It seems clear that a defendant, in order to exculpate himself, should not be required to establish the guilt of a third person with that degree of certainty requisite to sustain a conviction of the latter. On the other hand, it seems equally clear that evidence which simply affords a possible ground of possible suspicion against another person should be inadmissible. The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged. . . . It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration which led to the early adoption of the elementary rules that evidence to be admissible must be both relevant and material. It rests upon the necessity that trials of cases must be both orderly and expeditious, that they must come to an end, and that it should be a logical end. To this end it is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.' Accord: *People* v. *Perkins*, 8 Cal.2d 502, 514-515 [66 P.2d 631] ; *People* v. *Vatek*, 71 Cal.App. 453, 473 [236 P. 163] ; *People* v. *Gentekos*, 118 Cal.App. 177, 182 [4 P.2d 964] ; *People* v. *Wagner*, 21 Cal.App.2d 92, 95 [68 P.2d 277] ; *People* v. *Landry*, 106 Cal.App.2d 8, 12 [234 P.2d 736] ; Fricke on California Criminal Evidence, 5th edition, page 264; 40 Corpus Juris Secundum, sections 219-220, pages 1132-

1133. There was no error in the court's rulings upon the questions and offers of proof having to do with the subject of the Mafia.'' (Pp. 223-224.)

 We have commented heretofore upon the attenuated nature of the evidence proffered in support of the theory of suicide. Even less substantial is that relating to the possibility that some unnamed third person shot the victim. Defendant testified Bonnie had no enemies that he knew of; that he never saw any of her customers; Richards made no objections to her activities on his premises. There is no slight evidence of any difficulties between her and any man friend or any one else. Joseph Hamilton, who said he saw Bonnie every night for two and one-half years because ''I am a man in the world of life'' testified that ''every time I seen her more or less she was laughing, when she didn't have a drink or two—— . . . in her.'' This record contains nothing of substantiality to support the theory that the crime was perpetrated by someone other than appellant, nor do the offers made by counsel rise to any greater dignity.

The judgment and order are affirmed.

Fox, P. J., and McMurray, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.