[Crim. No. 3189. Third Dist. Nov. 27, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. LESTER TAYLOR, Defendant and Appellant.

374

Donald L. Gilmour, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

SCHOTTKY, J.—Appellant was charged by information with the crime of murder and a jury found him guilty of

murder in the second degree. His motion for a new trial and for modification of the verdict was denied and judgment was entered sentencing appellant to state prison. Appellant has appealed from the judgment and from the order denying his motion for a new trial.

Appellant makes two major contentions which are:

I. The evidence produced does not support the verdict of murder of the second degree and shows, at most, if at all, that the defendant was guilty of voluntary manslaughter.

II. The district attorney was guilty of prejudicial misconduct in arguing to the jury that the prosecution was prevented by law from introducing evidence of the bad character of the defendant.

Before discussing these contentions, we shall give a brief summary of the evidence as shown by the record.

At approximately 7 p. m. on June 15, 1960, appellant and Joe Torres, along with a number of other persons, were in the lobby of the Jamal Hotel at 208 J Street in the West End of Sacramento. John Mohamed, a Pakistanian, was the hotel clerk on duty. According to Mohamed, all those present, except himself, had been doing considerable drinking. He testified, ''A. Well, it look like a crazy house to me. . . . A. Yes, all the wine drunk there. Q. They were having a wine party, is that what you are trying to say, Mr. Mohamed? A. Yes.'' Appellant and Torres were talking and the conversation appeared to be friendly until suddenly the appellant said something to Torres which prompted Torres to turn around and hit the appellant in the face two or three times. These blows broke appellant's nose and caused him to fall to the floor. At that time the appellant was bleeding badly. The attendant at the hotel gave him a paper towel to help him clean up. Torres took off appellant's shirt and gave him another one, but the shirt given the appellant by Torres did not fit so he took it off and again put on his own shirt. At that time the appellant said, ''I give up, I don't want to fight.'' During that time Torres said nothing to the appellant. Mohamed saw a closed pocket knife in Torres' hand when appellant was on the floor.

The appellant remained on the floor for 15 minutes, after which he left the hotel. He was gone two to four minutes, after which he returned. When he entered the lobby the victim was sitting in a chair with his hands flat on his knees, in what appeared to be a very peaceful repose. The appellant approached Torres and put his knee on a chair adjacent to

that in which Torres was sitting. He then raised his hand and hit Torres in the neck. Torres immediately fell to the floor, bleeding very badly and struggling to breathe. Torres never stood up nor did the two men ever come together. A pocket knife similar to Torres' was by his side. The appellant immediately fled from the hotel.

Torres died as a result of a hemorrhage caused by an incised wound over the carotid artery and the jugular vein on the left side of his neck. This single wound was three-fourths of an inch in length, three-eighths of an inch wide, and the depth of the penetration was one and three-fourths inches at an approximate downward angle of 45 degrees.

The police were informed that a man covered with blood had entered the Apex Hotel which was around the corner from the Jamal Hotel where the homicide took place. In room twelve of that hotel the police found the appellant standing behind a door. At that time he was wearing only his pants and shoes. He had no shirt or undershirt on. Appellant's bloody T-shirt was found rolled up and thrown behind the door in that room. Appellant's hat was on the bed. At that time it was in a slashed and torn condition. The blood which was on the hat was type ''O,'' which was the blood type of Torres and not the blood type of the appellant.

The appellant informed the police that he had been in a fight in a bar down the street, but he did not know whether it was the 905 Club or the Wagon Wheel. The appellant was asked if he wished the other person to the fight arrested and he said he did. The police followed the path of blood which led from the hotel room and found appellant's bloody shirt on the sidewalk. Appellant was then taken to the Jamal Hotel. At that time he appeared to the police to be frightened but not intoxicated, and he told the police he had been in a fight with Torres over a girl.

Approximately one hour later at the jail the appellant told the officers that he had been in the Jamal Hotel with some friends and that they had been drinking wine. While so engaged, a girl named Judy Beam engaged him in conversation. At about that time Torres entered and said that that was his girl and the appellant was to get away from her. The appellant then went to another girl in the lobby and said that this was his girl and that he was going to have a drink with her. This prompted Torres to come up to him and tell him to get out. The appellant said that he could stay if he wanted to. This statement caused Torres to pull a knife

and warn him, "Now get out of here or else." With that Torres slashed at the appellant's hat. The appellant said, "Well, you missed. Why don't you try it again?" The victim did try again. The appellant grabbed the knife and a struggle ensued. They fell to the floor with the appellant on top of Torres. At this time it was the appellant's opinion that the knife must have gone into Torres' body for he saw blood start to spurt all over the place. In this statement the appellant did not tell the police that he had been knocked to the ground and had his nose broken.

At the trial the appellant testified that he had known Torres prior to the day of the homicide. On the day of the homicide appellant had gone to the Jamal Hotel and drank there with several of his friends. He was told by Miss Beam that she had ended up at the Jamal Hotel that morning and that she wanted to get away but Torres would not let her go. The appellant told her that if she wanted to go he would go with her. She told him that she would try and get away and meet him at the Wagon Wheel. When she failed to keep the appointment, the appellant returned to the Jamal Hotel. He then told her that he was going to take a friend to Stockton and asked her to go along. She said she would. She warned him though that Torres would be very angry if she left. Miss Beam and the appellant started for the door, and Torres interposed himself between the appellant and the door and asked, "Where do you think you are going?" When the appellant said they were going to get a drink, Torres pushed Miss Beam into a chair and told her she was not going any place. He then asked what the appellant meant by butting into his business. Before the appellant could answer, Torres struck him in the nose, knocking him back so that his head hit the wall and causing him to sit down on the floor. Torres kept trying to persuade the appellant to get up and fight, but the appellant told him that he wanted no trouble with him and that he did not want to fight. Torres picked up the appellant's hat and jammed it down on the appellant's head. He then knocked it off his head. The appellant arose and the hotel attendant brought him some paper napkins to wipe the blood from his nose. Torres again approached the appellant, this time with a knife in his hand, and struck at the appellant. The appellant backed into the lobby, at which time someone yelled, "Let's break this up, boys, there is no use of you guys afighting here." With that Torres turned to the person trying to break

up the fight and told him that he would fight both the appellant and the pacifier. The appellant continued to retreat further into the lobby, and Torres turned and walked away down the hall. The appellant claims that in the course of this fracas the victim had slashed his hat several times.

Appellant testified that he did not remember ever leaving the hotel after this beating, although it was possible that he could have done so. He denied that he had a knife on his person.

The appellant saw Torres seated in the chair in the lobby and went to him in order to bury the hatchet, for as far as he was concerned the fight was over and he did not want Torres as an enemy. As he approached the chair Torres raised his hand and appellant saw the flash of a knife blade. With this, Torres threw all of his weight on the appellant, grabbed him by the arm, and forced him back into the chair. Suddenly, there was blood all over. After this the appellant fled.

The only witnesses who were in the lobby of the Jamal Hotel when the altercation took place were John Mohamed, the hotel clerk, and Marien Jacobsen. Mohamed testified that when appellant was on the floor he saw a closed knife in Torres' hand similar to the one found next to Torres' body; that he saw nothing in appellant's hand after appellant came back into the lobby; that after Torres fell and Taylor ran out of the lobby all of the others in the lobby cleared out except one who was so drunk he could not run out. This one was shown to be Jacobsen who was so intoxicated that when the officers came they took him to the city jail for the night. Jacobsen was the witness who testified that when appellant went out of the door after Torres fell he had a bloody knife in his hand. No other witness testified to this and no knife was found other than the bloody knife that was found lying on the floor about 6 inches from Torres' hand.

John Mohamed testified that Torres was a mean man; that Torres had slapped several persons during the day; that "if anybody open mouth he give him slapping to stop him. He was a tough guy." A police officer and two bartenders testified that Torres' general reputation for violence was bad.

Appellant makes a vigorous argument in support of his contention that the evidence does not support the verdict of murder in the second degree and that if he were guilty of any crime at all he was only guilty of voluntary manslaughter.

The crime of murder consists of two elements (Pen. Code,

§ 187) : 1. The unlawful killing of a human being; and 2. With malice aforethought.

Malice (aforethought) may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Pen. Code, § 188.)

Section 189 of the Penal Code defines the degrees of murder as follows: ''All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.''

[██] Voluntary manslaughter is the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. (Pen. Code, § 192.) It is a wilful act, characterized by the presence of an intent to kill engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought. ██ To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would naturally be aroused in the mind of an ordinary, reasonable person, under the given facts and circumstances, or in the mind of a person of ordinary self-control. (*People* v. *Bridgehouse,* 47 Cal.2d 406, 413 [303 P.2d 1018].)

Appellant argues that there is no substantial basis in the evidence for a finding of express malice, and that appellant's conviction of second degree murder must then rest upon a finding of implied malice, that is, an unlawful killing without considerable provocation, or with an abandoned and malignant heart.

Appellant's position before the trial court was that the homicide occurred lawfully when he repelled the movement of the knife in Torres' hand in defense of his person. He concedes that by rendering a verdict of guilty of murder in the second degree the jury, in effect, rejected the appellant's contention of self-defense. He then argues that Torres and appellant were not personally acquainted; that no prior ill-feeling existed on the part of the appellant; that each engaged in a drinking party; that each was sufficiently intoxicated to the extent that he should not be driving an automobile; that

Torres became surly and belligerent when the appellant attempted to leave with a woman who was acquainted with Torres; that Torres brutally assaulted and injured appellant, causing his nose to be broken and his face bloodied; that the appellant was knocked to the floor and subjected to further indignities by Torres; that Torres menaced the appellant with a knife while he was prostrate upon the floor; that appellant was absent from the scene for no more than a few minutes at the most before the combat in which the fatal injury was inflicted; and that the fatal injury was inflicted by Torres' own weapon, or by inference, by a second knife possessed by the appellant. He then asserts that under these circumstances the blows inflicted upon the appellant by Torres would naturally arouse a sudden passion, and such provocation is sufficient to reduce the homicide to manslaughter.

Appellant's argument is ingenious but unconvincing. To be sufficient to reduce homicide to manslaughter, the heat of passion must be such as would naturally be aroused in the mind of an ordinary, reasonable person under the given facts and circumstances, or in the mind of a person of ordinary self-control. (*People* v. *Brubaker*, 53 Cal.2d 37, 44 [346 P.2d 8].) The primary question in determining whether homicide is voluntary manslaughter is whether the defendant's reason was, at the time of his act, disturbed or obscured by some passion to such an extent as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. (*People* v. *Brubaker*, 53 Cal.2d 37, 44 [346 P.2d 8]; *People* v. *Borchers*, 50 Cal.2d 321, 329 [325 P.2d 97].)

Furthermore, before a homicide may be classified as voluntary manslaughter, it must appear that there was no "cooling" period, that is, after the "heat of passion" was reasonably and justifiedly engendered, "hot blood had not had time to cool" before the fatal act was committed, that is, the act that engendered the "hot blood" had occurred so shortly before the killing that reason had not had time "to resume its empire." (*People* v. *Wells*, 10 Cal.2d 610, 618 [76 P.2d 493].)

In the final analysis, the existence of provocation and its extent and effect, if any, upon the mind of defendant in relation to the existence of malice is a question of fact for the jury. (*People* v. *Thomas*, 25 Cal.2d 880, 903-904 [156 P.2d 7]; *People* v. *Wells*, 10 Cal.2d 610 [76 P.2d 493]; *People*

v. *Ogg*, 159 Cal.App.2d 38, 51 [333 P.2d 117]; *People* v. *Isby*, 30 Cal.2d 879, 891 [186 P.2d 405].) ▓▓ As this court said in *People* v. *Toth*, 182 Cal.App.2d 819 [6 Cal.Rptr. 372], at page 831: " 'Before the verdict of a jury which has been approved by the trial court can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. ▓▓ We must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. ▓▓ If the circumstances reasonably justify the verdict, the opinion of the reviewing court that those circumstances might also be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Frankfort*, 114 Cal.App.2d 680, 689 [251 P.2d 401].)' "

▓▓ We are unable to agree with appellant's contention that the evidence does not support the verdict of murder in the second degree, although we are frank to state that a verdict of manslaughter would have much stronger support in the record. In the instant case Torres had ceased attacking appellant and several minutes elapsed between the initial assault by Torres and the infliction of the fatal wound by appellant. The jury could find from the evidence that appellant returned to the hotel with a knife for the purpose of revenging himself. It was for the jury to determine whether appellant acted in self-defense, in the heat of passion, or with malice aforethought; and we cannot hold that the verdict is without substantial support in the record.

▓▓ Far more serious is appellant's contention that the district attorney was guilty of prejudicial misconduct when he stated in his closing argument to the jury: "Now, defense counsel kept arguing about the deceased's bad reputation for violence. Well, you know perfectly well that the prosecution is not permitted to bring in any evidence along that same line. He can bring in all the evidence he wants about the bad reputation of one of the parties in this type of situation, but the prosecution, according to law, can't do the same."

Counsel for appellant objected, stating, "Now you are trying to do by inference what you can't do legally." The court then stated, "You are not permitted to make any such statement, Mr. Sullivan, you will refrain from such. You just argue what the law says you can argue and discuss the

evidence that is before the Court, not evidence that is not before the Court.''

It should be borne in mind that a police officer had testified that the deceased, Torres, had a bad reputation for violence and that the People's witness, John Mohamed, had testified that Torres was a ''mean man'' and a ''tough guy.'' Quite understandably, appellant's counsel made much of this testimony in his argument to the jury, as he had a right to do. Undoubtedly, the district attorney felt it was necessary for him to say something to counteract this argument, and the above-quoted statement cannot reasonably be construed as other than an effort to get into the minds of the jurors the impression that if the law permitted he could prove that appellant also had a bad reputation for violence.

Respondent does not attempt to argue that the remarks of the district attorney were not improper, but argues that ''When the entire record in relation to this portion of the argument is read, it does not appear that the remarks of the district attorney were so prejudicial and so inflammatory that they could not have been corrected by a proper admonition to the jury.'' Respondent states also that ''Furthermore, as stated in *People* v. *Wein*, 50 Cal.2d 383, 397 [326 P.2d 457], such error in argument is not grounds for reversal. If the evidence of defendant's guilt is so strong that there is no reasonable probability that any result more favorable to the defendant would have been reached in the absence of the claimed misconduct, such misconduct does not constitute grounds for reversal (*People* v. *Watson*, 46 Cal.2d 818, 837, 838 [299 P.2d 243]).''

Counsel for appellant objected to the statements and stated the basis of his objections, but he did not make a specific request that the jury be instructed to disregard the district attorney's remark. The court only told the district attorney that he was not permitted to make any such remark and that he should only discuss the evidence before the court, not evidence not before the court. The statement of the district attorney clearly put into the minds of the jury the thought that the district attorney had evidence of the bad reputation of appellant for violence. We do not believe that an admonition by the court would remove such a belief. The statement of the district attorney was improper and highly prejudicial.

What was said in *People* v. *Talle*, 111 Cal.App.2d 650 [245 P.2d 633], at page 677, is applicable:

''The argument of the district attorney, particularly his

closing argument, comes from an official representative of the People. As such, it does, and it should, carry great weight. It must, therefore, be reasonably objective. It is no answer to state that defense counsel also used questionable tactics during the trial and therefore the district attorney was entitled to retaliate. Defense counsel and the prosecuting officials do not stand as equals before the jury. Defense counsel are known to be advocates for the defense. The prosecuting attorneys are government officials and clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige. It is their duty to see to it that those accused of crime are afforded a fair trial. The applicable rule was admirably stated in *Berger* v. *United States,* 295 U. S. 78, 88 [55 S.Ct. 629, 79 L.Ed. 1314], quoted with approval in *Viereck* v. *United States,* 318 U.S. 236, 248 [63 S.Ct. 561, 87 L.Ed. 734] : ' "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." '

"District attorneys are, of course, to be commended for investigating crime and in prosecuting, with vigor, those accused of crime. But prosecutive zeal and honesty in belief of guilt are not a substitute for the orderly, lawful and constitutional processes and guarantees. . . ."

 Also applicable is the following language in *People* v. *Linden,* 52 Cal.2d 1 [338 P.2d 397], at page 27 :

"It seems that prosecuting officials sometimes consider a holding that particular misconduct is error but not, in the circumstances, prejudicial, as establishing that as a matter of law the conduct is cause for mere rebuke but not reversal (see *People* v. *Wilkes* (1955), 44 Cal.2d 679, 687 [8] [284 P.2d 481]), and continue to try their cases improperly in the expectation that, should a conviction be obtained, the appellate court will uphold it under section 4½ of article VI of the

California Constitution (see *People* v. *Lyons* (1956), 47 Cal.2d 311, 319 [8] [303 P.2d 329]). Conduct of that kind demeans the office of prosecutor and his profession. Because it relates to the jury's selection of penalty it implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision save the verdict.''

 It is true, as argued by respondent, that misconduct does not constitute ground for reversal in a case where there is no reasonable probability that a result more favorable to the appellant would have been reached in the absence of the claimed misconduct. But we are convinced that the evidence in the instant case was such that it is highly probable that the appellant would have been found guilty of manslaughter, or even might have been acquitted, in the absence of the said misconduct. It is to be noted that the record shows that the instant case was submitted to the jury at 2:25 p. m. and that the jury returned to the courtroom for the reading of some of the evidence and the rereading of the instructions before finally returning their verdict at 11:10 p. m. We repeat what our Supreme Court said in the very recent case of *People* v. *Love,* 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809] at page 733 : ''. . . In *People* v. *Linden,* 52 Cal. 2d 1, 27 [338 P.2d 397], we pointed out that error tending to affect the jury's attitude in fixing the penalty 'implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision [art. VI, § 4½] save the verdict.' We find no such circumstances in this case, and we are convinced that it is 'reasonably probable that a result more favorable' to defendant 'would have been reached in the absence of the error' and that accordingly the error is prejudicial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)''

The judgment and order are reversed.

Peek, P. J., and Pierce, J., concurred.